THEODORE J. AND JOAN D. GILL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; RAYMOND C. AND MARLYS A. SCHLICHTING, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gill v. Commissioner
Docket Nos. 13312-92, 13314-92
United States Tax Court
T.C. Memo 1995-328; 1995 Tax Ct. Memo LEXIS 324; 70 T.C.M. (CCH) 120; July 24, 1995, Filed *324 Decisions will be entered for respondent. For petitioners: Frank J. O'Connell, Jr.
For respondent: Jack Forsberg. DINAN
DINAN
MEMORANDUM OPINION DINAN, Special Trial Judge: These consolidated cases were heard pursuant to the provisions of section 7443A(b)(3) of the Code and Rules 180, 181, and 183. [1]
Respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket No. 13312-92
Year
Deficiency
1988
$ 2,754
1989
1,196
1990
1,543
Docket No. 13314-92
Year
Deficiency
1988
$   211
1990
379
The issue for decision is whether amounts received by petitioners from Jack Frost, Inc. were net earnings from self-employment subject to the self-employment tax. For convenience we have combined our findings of fact and opinion with respect to the issue in these cases. Some of the facts have been stipulated. *325 The stipulations of fact and accompanying exhibits are incorporated herein by this reference. Petitioners resided in the State of Minnesota when they filed their petitions. Jack Frost, Inc. (Jack Frost), a Minnesota corporation, is a wholly-owned subsidiary of JFC, Inc.JFC, Inc. and its subsidiaries produce, process, and market chicken products under the brand name "Gold'n Plump". Jack Frost buys breeder stock (chicks) from primary breeders. They are placed in pullet raising buildings for 20 weeks. The pullets are then moved to breeder houses where the males and females are matched for the natural reproductive process of fertilizing the eggs. The fertilized eggs are then refrigerated and shipped to hatcheries where they are placed in incubators for 18 days. The eggs are next placed in trays where they hatch in about 3 days. Finally, the chicks are transported to broiler barns where it takes between 45-50 days for the broiler chickens to reach the desired size for processing and marketing. Jack Frost contracts with farmers (growers) to raise the broiler chickens. During the years in issue, Jack Frost published and distributed a brochure entitled "A Partnership That Works". The *326 brochure provided, in part, as follows: For years, Gold'n Plump Poultry, a leading local marketer of fresh chicken products, has been quietly joining forces with farmers in the area like yourself. Gold'n Plump has made special arrangements with selected local farmers to grow high quality chickens you're used to purchasing in the supermarket meat case. Gold'n Plump provides all the training, expertise and advice. It assists in the financial arrangements and construction of the special barns. It offers to its farmers incentive packages and bonuses. The Gold'n Plump family of "Partners" invites your application to see if you qualify. In doing so you will join a growing family of hundreds of profitable happy farmers who have secure, stable futures ahead of them. Petitioners applied to become participants in the Gold'n Plump family of "Partners" and were accepted. In selecting potential growers, Jack Frost requires that they have adequate land on which to construct a broiler barn (barn) and the ability to maintain the facility; i.e., someone who is a handyman. They would also have to have the finances necessary to construct a barn and to carry any construction loan obtained to build *327 the facility. Jack Frost provides the specifications for the construction of the barns. In that way, the barns are designed and constructed essentially the same. That affords Jack Frost the ability to predict with some accuracy the outcome of its barn production programs. The square footage of the barn is a determinant of the number of birds in each flock that can be raised in the barn. Most of Jack Frost's barn owners have gone to their local financial institutions to obtain the financing necessary to construct their barns but Jack Frost actively participates in the financing by coordinating the lending activity between the financial institution and the barn owner. Typically, the barn owner assigned to the lender the amounts due under his agreement with Jack Frost as security for the loan. The payments were then made directly to the lender by Jack Frost. Both the Gills and the Schlichtings constructed barns on their farms with financing obtained by them with the assistance of Jack Frost. Jack Frost enters into growing agreements and supplemental rental agreements with the barn owners, and those agreements with each owner are basically the same. The growing agreement is the base *328 agreement. Jack Frost has periodically adjusted the amount of the base payment to the growers under the growing agreement. It is entered into for a term of 10 years, which coincides with the usual term of the loan obtained by each barn owner to finance the construction of his barn. For instance, on November 2, 1978, Jack Frost executed a growers agreement with the Gills. The agreement noted that the Gills own a barn with inside footage of 32,000 square feet. Jack Frost agreed to pay the Gills 4.5 cents per month per square foot for the poultry facility. The monthly payment was to be $ 1,440. Jack Frost was to pay the monthly amount of $ 1,440 to or for the benefit of the Gills until the Gills had paid Production Credit, the lender who financed the construction of the Gills' barn, the $ 88,100 due under a note dated June 14, 1978. Jack Frost was to deduct $ 1,070 from the monthly $ 1,440 payment due the Gills and pay that amount directly to Production Credit. The goal of the growers was to satisfy the financial obligations they incurred to build their barns. Jack Frost also entered into supplemental rental agreements with the barn owners. The purpose of the supplemental rental payments *329 was to compensate for the effect inflation had in increasing the costs incurred in constructing the barns. For instance, on November 2, 1978, Jack Frost also executed a supplemental agreement. The supplemental agreement noted that the payments provided for in the growers agreement were predicated upon on an estimated construction cost of $ 95,000 for the Gills' barn. The supplemental agreement further noted, however, that the cost of the barn would exceed the $ 95,000 figure by $ 75,800. Jack Frost, therefore, agreed to give the Gills additional payments to offset the increased construction cost. The supplemental agreement provided: That until the Supplemental Loan is paid in full or until the Growing Agreement attached hereto is terminated in accordance with its terms, whichever occurs first, [Jack Frost] shall pay to Production Credit the sum of $ 980 per month as additional payments under [the Growing Agreement]. The typical growing agreement, as exemplified by the Gills' of November 2, 1978, provided, inter alia: I. PURPOSE OF AGREEMENT
A. The Supplier will furnish to the Grower broiler chicks or pullets on a regular basis during the term of the agreement. B. The *330 Grower will supply facilities for the birds on the premises described above, and the Grower will care for the birds in accordance with Supplier's poultry management program which will be modified from time to time by Supplier, either in written form or verbally through Supplier's personnel (herein "Poultry Management Program"). Any and all management check lists issued by Supplier's service personnel shall be considered a part of the Poultry Management Program. * * * IV. COVENANTS OF SUPPLIER
A. Supplier shall: 1. Pay for electricity required to service the Poultry Facility. 2. Deliver pullets or broilers to Grower's farm. 3. Deliver all necessary feed into Grower's bulk bin to raise Supplier's pullets or broilers. 4. Deliver and pay for medication, litter and sanitation supplies for Supplier's pullets or broilers. 5. Pay for fuel as needed in the Poultry Facility. B. Supplier shall carry and pay for insurance on it's [sic] birds, feeds and supplies. C. Supplier shall provide a serviceman, without cost to the Grower, whose duty will be to periodically advise and counsel the Grower concerning management techniques and methods. V. COVENANTS OF GROWER
*331 A. The Grower will supply the same degree of attention and conformance to good poultry management practices to Supplier's pullets or broilers as a prudent independent poultry grower would use on his own birds where his income would be directly affected by the results of his flock. B. The Grower shall furnish the land, building(s) and equipment necessary for the care of birds according to the Poultry Management Program. C. The Grower will care for Supplier's birds in accordance with the Poultry Management Program. D. The Grower shall supply and bear the expense of the following production items: 1. Water. 2. Repairs and maintenance to keep equipment and building in a state of repair sufficient to meet the specifications of the Poultry Management Program. 3. Light bulbs. 4. All labor used on the farm to care for birds, including removal of manure and including labor to load the broilers on Supplier's or processor's truck. E. The Grower shall keep all records reasonably requested by Supplier and promptly submit mortality records each week. F. The Grower shall carry fire and extended coverage insurance on the buildings and equipment used under this agreement *332 with a copy of the policy submitted to the Supplier if requested, and the coverage on the buildings and equipment shall be at least equal to the unpaid balance of Grower's financing of the building and equipment. Grower shall also carry and pay for liability coverage for bodily injury and property damage. Supplier shall be named as an additional insured under all such policies. G. Grower is responsible for all taxes on the building, equipment and other items owned by him, and Grower also agrees to pay all applicable employment taxes on the persons he employs, if any. H. Roads: 1. In winter, Grower agrees to keep roadways clear of snow to all Supplier's vehicles. 2. In all times of the year Grower agrees to keep the roadways in such state of repair that Supplier's vehicles can operate normally. I. Grower will have no poultry on the farm other than the poultry owned by Supplier. J. Grower shall be responsible for the removal from building and disposal of all dead birds by any sanitary method. This may be accomplished by the use of an incinerator or poultry disposal pit. K. Grower acknowledges that Supplier shall have full title to the birds and may dispose of them *333 at its discretion with or without consultation of the Grower. L. When instructed by the Supplier's serviceman, Grower will thoroughly clean and disinfect the interior of building and the equipment. M. Grower hereby grants Supplier full rights of ingress and egress to and from Grower's property for all purposes necessary to carry out the terms of this agreement. N. Grower grants Supplier access to the poultry facility at all times during its term of this Agreement. VI. UNUSUAL CIRCUMSTANCES AND TERMINATION
A. If Supplier determines that changing methods of poultry management require moderate changes in the poultry facility, grower agrees to make such changes. Any changes so made will be done at the lowest possible cost (normally Supplier's net cost) and the cost shall be paid one-half by Supplier and one-half by Grower. Supplier agrees to aid in obtaining financing for Grower for such changes, if requested by Grower. B. If either party shall violate any material term or condition of this agreement, the other party may terminate the agreement upon thirty (30) days written notice. C. Supplier may terminate this Agreement if faced with serious losses created by continuingly low broiler prices or loss of processing outlet. With termination under this paragraph during the first eight years after the Poultry Facility is originally constructed Supplier will pay Grower one-half of the Grower's unamortized cost of the facility. The cost shall be the original cost of the facility less proceeds from the sale of all the equipment. Such cost shall have an eight year life. The unamortized cost will then be calculated as follows: *334 * * * In addition to the monthly base payment and the supplemental monthly payment, the typical growing agreement also provided for an incentive bonus and a marketing bonus. The incentive bonus was to reward the grower for savings achieved by better than average results for a given period of time and for cooperating with Jack Frost and its service personnel. The marketing bonus was intended to be an extra payment to the grower per bird raised, depending on the market price. The schedule and formula of the marketing bonus could be adjusted upward or downward from time to time by Jack Frost to reflect changing broiler industry trends. The marketing bonus was also conditioned upon full cooperation by the grower with Jack Frost *335 and Jack Frost's service personnel. Jack Frost leases approximately 200 broiler barns. All of the barns are automated; i.e., they have automatic feed, water, and ventilation systems. Approximately 25 percent of the barns are also computerized. The Gills' and Schlichtings' broiler barns were not computerized. During a typical year, approximately six flocks of broilers are raised in each barn. It takes 45-50 days on average to raise a flock of broilers to the desired size for processing and marketing. In order to allow the grower sufficient time to prepare for each new flock, the standard growing agreement provides that the grower will be allowed at least 10 days from the time the last birds are loaded out until the new chicks arrive. Thus, broilers are not raised in the broiler barns for approximately 60-80 days during a 365-day year. One of the covenants agreed to by the grower, as set forth in the growing agreement, is that the grower will care for Jack Frost's birds in accordance with Jack Frost's Poultry Management Program. Jack Frost published a Grower Procedure Manual which outlined the regimen to be followed by the growers from the time a new flock of chicks was delivered *336 to the barns through the load out of the broilers after the 45-50 days required to grow the birds to the point where they could be processed and marketed. A copy of a Grower Procedure Manual is attached as Appendix A. Jack Frost employs broiler field service representatives (representatives) who are responsible for overseeing the implementation of Jack Frost's Poultry Management Program. They have keys to all of the barns leased by Jack Frost and call upon the barn owners once or twice a week. They are on call 24 hours a day, 365 days a year and have varied responsibilities. A job description for a representative, prepared by Jack Frost, is attached as Appendix B. Of particular interest is the provision that the representative has no responsibility for supervision over the growers. The representative does, however, monitor the broiler raising activities of the growers and prepares reports for Jack Frost. If a visit to a grower's barn reveals any shortcomings, the representative calls them to the attention of the grower. During the years in issue, Mr. Schlichting was a pipefitter and worked 40 hours a week. At the time he signed his growing agreement with Jack Frost, he had no training *337 in raising broilers. He generally received six flocks of birds to raise each year. He followed the procedures in the Grower Procedure Manual in raising the birds. Before a new flock of birds was delivered, each floor of the barn was divided into "thirds", i.e., one-third of the length of the barn, by plastic curtains which could be rolled up and down. As the birds grew, he would raise the first curtain to provide two-thirds of the floor space available to the birds and then the second curtain to allow the birds full use of the barn floor. There are 20 thermostats, 10 per floor, which control the delivery of heat to the barn and the operation of the fans in the barn. The barn is ventilated by the use of fans and ventilators (vents). There are 12 fans on each floor and many vents. The vents on one side of the barn are controlled automatically by the air pressure inside the building. The vents on the opposite side of the barn are manually controlled. To cool the flock down on a hot summer day, fans must be operating properly and the vent system must be opened. The most important aspect of raising broilers is to maintain the environment in the barn, i.e., making sure that the fans *338 are running on schedule, that the heaters are working, that the vents are properly adjusted, and that all other facets of the operation are suitably maintained to effect the desired environment. In order to provide water to the birds, Mr. Schlichting's barn had a cup watering system. The system consisted of three water lines that traversed each floor of the barn. There are approximately 400 plastic watering cups on each line to water the birds. There were also feed lines on each floor of the barn that automatically operated an augur system that fed the feed through the lines to the birds. Monitors installed in the barn were hooked up to an alarm system to warn when there was a break-down in the heating and power systems in the barn. The alarm would sound in the Schlichtings' bedroom and in the barn boiler room. Once he was informed that a new flock of birds was to be delivered to his barn, Mr. Schlichting, in accordance with the instructions set forth in the Grower Procedure Manual, would spread shavings on the floors of the barn. He would then lower the plastic curtains to cordon off one-third of the floor; lower the water and feed lines; spread paper under the feed lines; and adjust *339 the temperature in the barn. When the birds were delivered, he helped to unload them. During the first 35 days after a new flock was delivered, Mr. Schlichting set out 100-150 feeder flats for the birds and placed feed in the flats twice a day. As the birds grew, he had to raise the water and feed lines periodically. He would also raise the plastic curtains to expand the floor space from one-third to two-thirds and, finally, the entire floor area. Twice daily, in the early morning and in the late afternoon or early evening, Mr. Schlichting would "walk the barn" to assure that everything was in order. Most importantly, he recovered on a daily basis, dead birds which he incinerated. He was required to maintain a daily mortality log for Jack Frost's edification. Mr. Schlichting has a small tractor that he uses to spread shavings on the floor and to clean the barn. He begins his cleaning operation on the second floor of the barn and dumps the litter through clean-out doors on the second floor to the first floor; he then cleans the first floor. He usually accumulated 12-14 loads of litter from the barn cleaning that he would spread as fertilizer on his fields. Once a year, when the *340 entire barn is cleaned, he vacuums the barn to rid it of dust and sprays the entire barn with a disinfectant. Mr. Schlichting does all of his own repairs and maintenance, including repairs to all equipment used in the growing operation. His wife, his son and his daughter assisted him in raising broilers. He paid his son John and his daughter Ann $ 6.00 to $ 6.50 an hour for their labors. At trial, the parties stipulated that Mr. Gill was prepared to testify in a manner similar to Mr. Schlichting pertaining to his activities growing broilers for Jack Frost. Mr. Gill's wife, and daughter Michelle, helped to raise the broilers and Mr. Gill paid Michelle for her labor. Petitioners argue that they did not materially participate in the production or the management of the production of poultry in the barns that they leased to Jack Frost, and that the amounts they received from Jack Frost are thus excluded from the term "net earnings from self-employment" as contained in section 1402(a)(1) because they are rental payments. Section 1402(a) provides that: The term "net earnings from self-employment" means the gross income derived * * * from any trade or business * * * except that in *341 computing such gross income * * * -- (1) there shall be excluded rentals from real estate and from personal property leased with the real estate * * * except that the preceding provisions of this paragraph shall not apply to any income derived by the owner * * * of land if (A) such income is derived under an arrangement, between the owner * * * and another individual, which provides that such other individual shall produce agricultural or horticultural commodities (including livestock, bees, poultry, and fur-bearing animals and wildlife) on such land, and that there shall be material participation by the owner * * * in the production or the management of the production of such agricultural or horticultural commodities, and (B) there is material participation by the owner * * * with respect to any such agricultural or horticultural commodity. Respondent argues that amounts received by petitioners from Jack Frost did not constitute "rentals from real estate and from personal property leased with the real estate" within the intendment of section 1402(a)(1). Respondent further argues that, even if we were to assume that the amounts received by petitioners did constitute "rentals from *342 real estate and from personal property leased with real estate" for purposes of section 1402(a)(1), such amounts come within the material participation exception to the exclusion for rentals from real estate. We will address ourselves to the "rental" issue. In Stevenson v. Commissioner, T.C. Memo. 1989-357, taxpayer operated a one-man business in which he sold and rented portable advertising signs. He contended that the exclusion for rentals from real estate and from personal property leased with the real estate applied to his business, thus exempting him from liability for self-employment tax. We there held that the concept of "net earnings from self-employment" used in section 1402(a) provides the standard not only for liability for self-employment taxes but also eligibility for Social Security benefits. We noted that the statute defining eligibility for Social Security benefits contains language "almost identical" with that in section 1402(a). 42 U.S.C. sec. 411(a) (1988). We also held: "The two sets of statutes should be construed to promote 'a symmetrical parallel between the social security eligibility provisions *343 for self-employed persons and the corresponding income tax provisions for taxing self-employed persons for social security purposes * * *.' Johnson v. Commissioner60 T.C. 829, 833 (1973)." We then observed that in order to achieve the Congressional policy of insuring that the optimum number of potentially eligible persons will be provided for under the Social Security provisions, exceptions from the tax are to be narrowly construed. We said in Stevenson v. Commissioner, supra: In Delno v. Celebrezze, 347 F.2d 159 (9th Cir. 1965), involving the parallel provision of 42 U.S.C. sec. 411(a), the Court explained that Congress realized that the income of self-employed persons is in most instances a combination of income from both labor and invested capital, and deliberately chose not to attempt the difficult, if not impossible, task of separating one from the other. The court (347 F.2d at 163) explained the exclusion for rentals as follows: The Committee reports accompanying the bill which included section 211(a)(1) of the Act make *344 it clear that not all payments which might be considered "rent" in ordinary parlance are to be excluded from self-employment net income. * * * The apparent intent of Congress was that section 211(a)(1) [42 U.S.C. sec. 411(a)] should be applied to exclude only payments for use of space, and, by implication, such services as are required to maintain the space in condition for occupancy. If the owner performs additional services of such substantial nature that compensation for them can be said to constitute a material part of the payment made by the tenant, the "rent" received then consists in part of income attributable to the performance of labor which is not incidental to the realization of return from passive investment. In such circumstances, the entire payment is to be included in computing the recipient's "net earnings from self-employment." [Emphasis added.] Petitioner's income from his portable sign business does not fall within the exclusion as here explained by the Court. It is thus taxable under section 1401(a). As more fully explained in our discussion of petitioners' material participation in raising poultry pursuant to their *345 agreement with Jack Frost, supra, the amounts they received from Jack Frost were in substantial part compensation for the services performed by them in raising the poultry and thus, did not constitute "rent" excludable from self-employment income. As we understand petitioners' position, they contend that they performed little physical work in raising Jack Frost's poultry; their labors were allegedly substantially related to the upkeep of their barns. The physical work they performed and the expenses they incurred are alleged to be consistent with similar work performed and expenses incurred by any landlord under a real property lease. We disagree. The long and short of it is that petitioners and their children performed each and every task necessary to raise the flocks of birds delivered to them by Jack Frost. The performance of the tasks necessary to raise the birds was the responsibility of petitioners and those they employed -- no one else. We have considered all arguments made by petitioners and, to the extent not discussed herein, find them to be without merit. We hold that petitioners materially participated in raising the flocks of birds delivered to them by Jack Frost. *346 The payments received by petitioners from Jack Frost, therefore, may not be excluded from net earnings from self-employment as "rentals". To reflect the foregoing, Decisions will be entered for respondent. APPENDIX A Grower Procedure Manual I. Starting - Before Chicks Arrive Getting the chicks off to a good start is most important in that it has a direct effect on how the birds do during the duration of the flock. These conditions include proper room temperature and easy access to feed and water. A. Spread shavings as soon as possible after they are placed in barn. Level them even to approximately 3". When reusing litter, all wet and caked litter must be removed. B. Lower feed and water equipment to waist height and inspect for repairs, clean out old feed, dust, etc., and then lower onto shavings. C. Replace any burnt out light bulbs and wipe off other bulbs. Cleaning adds to bulb life and provides a more even light. D. When using paper to start chicks, use 6' paper and place directly under feeder pans in brooding area. When using feeder flats distribute eight per 1,000 chicks evenly along feed/water lines, (but not on paper). Add small amount of starter *347 feed to each feeder flat the day chicks arrive and keep increasing as birds increase in feed consumption. Add one scoop of feed to 2 1/2 feed pans making for easier access for chicks in and out of feed pan. E. Position waterers (Swish) with pipes pushed into the shavings and adjust water level so chicks can drink easily. Make sure chicks can drink without stretching. Be sure all waterers are clean and working properly. Fill waterers with water before the chicks arrive so that they have warm water. Adjust pressure so water level is no lower than 1/4 in from top of cap. Nipple type drinkers, lower lines so chicks look up at the nipple. F. Place a small amount of feed down the center of floor paper the day chicks arrive if possible. G. Clear a three foot wide path in shavings from the building's end door through the brooding area for wheeling in chicks. H. Start up and adjust heating system at least one day before chicks arrive (may require more time in extreme cold weather). Adjust heat thermostat for 88-90 degrees. Place one thermometer next to each heat thermostat and one on third post in from each partial brood curtain. All thermometers should be 2' from floor. Birds *348 will not be dumped with temperature less than 80 degrees. It is important to have a warm floor. I. Keep door between furnace room and barn closed -furnance controls are sensitive to dust. J. Grower and extra help should be present when chicks arrive to help get them placed in the brooding area as quickly as possible. Help requirement, at time of placement, minimum of two adults. II. Starting - Chick Arrival Through 2 Weeks of Age A. Make sure that temperatures will be suitable (87-90 degrees) for chick delivery - if there seems to be a problem with attaining this temperature before delivery, let your serviceman and the delivery people at the hatchery know before they set up your delivery. Notify hatchery in morning of chick delivery day if there is a problem getting temperature up. B. As the chick carts are wheeled into brooding area, dial light dimmers down so the chicks will stay quiet while all boxes are dumped and carts, boxes, and papers are wheeled back out of brooding area. Hatchery box pads, will remain at the farm. Growers need to dispose of them ASAP. C. Distribute chicks evenly on the floor paper while emptying chick boxes. Dial lights back up as soon as *349 possible after chicks are placed. D. Level shavings back into the path. This may be more easily accomplished while lights are still dialed down, or while dumping birds. E. After chicks are settled, check room temperature and see that all waterers are working. F. Turn on feed drags to pull in fresh feed in feed pans. Select the proper switch outlet for intermediate control pan. G. Pick up dead or cull birds often and record all mortality daily. Accuracy is important. The morning after delivery, be sure to recheck the height of waterers. They may need to be lowered because the shavings have packed and left the waterers too high. H. Place fresh feed on feeder flats as required, at least twice a day feeding is necessary. Do not over fill flats so that chicks scratch feed out into the litter. I. After the second day, do not place feed on floor paper when used with feeder flats. J. On the 3rd day, roll up and remove floor paper from the building. Feed no more on paper than chicks will have cleaned up by the third day. ** Note: Follow the fan schedule as directed by your serviceman. In most cases a modulating fan will need to be started on the first or second day to *350 keep humidity down. Set up standby fan. K. At three days of age, begin to reduce barn temperature gradually to reach 85/82 degrees by 7 days of age. L. Gradually reduce barn temperature to 78 degrees by 2 weeks. M. At five days of age, raise drinkers so the pipe swings above the litter. Clean drinkers as required. (Swish only). Nipple drinkers are always the height where birds look up to trigger the nipple. N. At 7 days, raise first brooding curtain (the one farthest from feed tanks). 1. While plywoods are still in place turn on modulating fan in that end of the barn to pull warm air that direction. 2. Turn heat up to 85 degrees before moving birds at 8 days. 3. Level end drinkers the same level as center 1/3. O. Move 2 flats per post along each feed line to the end and feed on those flats for 2 more days (or as required to move birds out). Remove 1/3 of the flats for three days, starting on the 9th day. Remove, wash and air dry all flats as soon as possible after removal. P. It may be necessary to manually pull feed away from control pan switch a few times a day until birds are eating out of it sufficiently to operate automatically. Be sure light is working *351 above feed control pan, this will insure bird movement around that area. Check with serviceman on vaccination date, moving time and temperature. III. Feeding A. The feeding program includes four types of feed: Starter, grower, finisher and final finisher. Starter feed needs to be completely emptied from the tank before grower is delivered. Final finisher is used only on the last 3 to 4 days, it is essential to have it used up. Please consult your serviceman about the procedure. B. Feed should be ordered two days before feed is needed. This allows the feed mill adequate time for scheduling and delivery. Grower need to check feed tanks on Friday morning. This will eliminate feed outages over the weekend and help stop any unnecessary weekend deliveries. This is most important for keep full buildings. It has been our experience that birds will eat different amounts from day to day. Keep full is handled by the computer and is judged only on the average flock. C. Place feed order by dialing 251-3570 locally, or 1-800-572-0521 (toll free) if long distance. D. Feed should be ordered so there is little or no finisher feed left in tanks at loadout time. This saves the feed mill *352 an extra trip out to pick up leftover feed before bringing starter out for next flock. You will also need to talk with your serviceman about ordering "final" finisher. E. A "tentative" feed order should be placed two days ahead of time for the last load, and the final amount needed called in the day of delivery to make this load more precise. IV. General Management A. Carefully observe bird behavior and contact your serviceman if you see anything indicating possible health or mortality problems. B. Avoid, as much as possible, scaring the birds. This causes body bruises which will be trimmed at the processing plant, causing downgraded birds. C. From approximately 10 days on, the drinkers need to be continually raised and adjusted so the bottom of drinker is at average bird back height. (Swish only). D. From approximately 3 1/2 weeks on, feeders should be raised at least weekly so that the top lid of feed pan is 1" below average bird back height. E. If litter gets wet by waterers or feeders, it should be stirred. Remove if it becomes caked or hard. F. Follow closely any special instructions of your broiler serviceman. G. Fall Checklist must be completed January *353 1. H. In Winter, keep snow plowed to allow easy access to feed and fuel tanks and boiler room. ** Note: These guidelines may be modified by serviceman if flock has special health problems, etc. V. Loadout A. In Winter, be sure driveway and ends of barn, as well as one side, are plowed free of snow. B. Shut off feed as directed by Jack Frost Personnel, to assure best quality and processability. C. Feeding equipment should be raised at the time grower was told to have birds out of feed. D. Be sure and shut off heaters and circulating pumps. ** Note: Don't forget to remove hoppers and downspouts before raising feed lines. E. VERY IMPORTANT - Raise waterers no earlier than one hour before loadout time to avoid excessive shrinkage. F. Double-walk full barn to remove ALL dead birds. G. Be sure all equipment cables, lath, etc. are out of catching crews way. Be sure all circulating fan guards are replaced or fan and bracket removed. H. Grower must be present during complete loadout. Make sure birds are handled carefully. Report any carelessness to head of catching crew and to serviceman. I. Barn temperature should be as close to 55 degrees as possible *354 approximately one hour before loadout. This helps decrease foggy building conditions in cold weather and pre-conditions birds for the trip to the processing plant. J. IMPORTANT: When loadout crews open the end doors of the building, the static pressure drops and temperatures, especially in the center one-third of the building can rise rapidly, even in cold weather. Circulating fans will help this situation and also loadout or shavings doors in this area may need to be opened. Plastic should be removed from doors and fans in this area for loadout so we can get air to the birds when they are pushed together for catching. VI. Cleanout - Start as soon as possible after loadout A. Remove and dispose of any remaining dead birds. B. Wash, sweep, or blow dust from walls, ceilings, fans, and controls. C. Remove litter as directed by serviceman. Remove all caked/wet litter from areas where it will be reused, before any tilling is done. D. Manure should not be piled in or around loadout areas, and needs to be removed from proximity to the building as soon as possible. E. Disinfect as directed by serviceman. F. Inspect floor for holes and repair. G. Spread shavings as *355 soon as possible after they are delivered. H. In Winter, re-seal doors and openings so building is tight. This includes fan louvers. I. Be sure snow is removed from shaving doors so shaving truck is able to get close enough to barn. Have plastic off shavings doors and unlock day of shavings delivery. ** Note: Quality can be directly affected by the overall ventilation program. Proper coordination of fans and vents to achieve desirable environment, without excess fuel usage and/or electricity, is a very important part of an effective poultry management program. Chickens are our business. We take pride in a quality "Gold'n Plump" bird. Any question you may have is important. Feel free to call your serviceman. Always call your serviceman in the event of an emergency. Listed below are each serviceman and telephone number: Cel Thielen
252-3465
Jeff Carr
261-5282
Bill Lanners 253-6397
Dave Koester
363-8332
El Statz
387-2298
Ralph Michelson
252-6418
Larry Swift
253-3197
Ron Holmer
259-0507
Doug Host
253-1625
Bill Petz
393-4882
Weekend Page Number for Service/Parts - 255-6957 (When you call this number you will get Answer, Inc., ask to leave a message for *356 Jack Frost Parts or serviceman, and they will contact person on call) Feed Order Number - 1-800-572-0521 (Toll Free) Local - 251-3570 VERY IMPORTANT * Test run generator 30-45 minutes, under load, each week. * Test alarm system at least once a week. Adjust high and low settings as the flock progresses. APPENDIX B JOB TITLE: Broiler Service Representative DIVISION: Broiler KNOW-HOW: Generally requires a basic command of a specialized body of knowledge or a thorough knowledge of all facets of a segment of the business operation. Must have good communication skills. Position may require ability to collect and analyze data and prepare management reports. IMPACT: Performs staff functions which have considerable impact a large part of the company (several departments) or a line position which is held directly accountable for a small part of the total company (a department or unit). INDEPENDENT JUDGEMENT: Directed by established objectives which clearly define when and what is to be accomplished but the employee may determine how. Although precedent and procedures may exist for many of the responsibilities, the employee has the authority to develop new methods *357 to get the job done. Supervisory review may be weekly or at the completion of a project. Supervisor readily available for unusually complex problems or sensitive issues. SUPERVISION: No responsibility for work direction supervision. CONTACTS: Frequent external contacts which often go beyond the level of information exchange. The nature and importance of contacts requires tact, judgement and effective communications skills to maintain good working relationships, or to resolve problem situations. WORKING CONDITIONS: Works regularly under poorer than average conditions, either because of an uncomfortable environment or because the job demands regular and sustained mental effort or moderately heavy physical effort (20-60 lbs.). (Give credit for travel over 40%.) DIMENSIONS: - College degree in an agricultural related field and 2 years of relevant experience or equivalent experience. - Must have a valid Class C driver's license. - Ability to work in dusty working conditions. Footnotes
1. All section references are to the Internal Revenue Code in effect for the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩